No. 34,947

THE STATE OF KANSAS, *Appellee,* v. FRED H. REYNOLDS, *Appellant.*

(107 P. 2d 728)

Opinion filed December 7, 1940.

*E. T. Riling* and *John J. Riling,* both of Lawrence, for the appellant.

*Jay S. Parker,* attorney general, *A. B. Mitchell,* assistant attorney general, *Milton P. Beach,* county attorney, and *William E. Scott,* special counsel, for the appellee.

*Warden L. Noe,* attorney for the Kansas State Board of Agriculture, and *William E. Scott,* attorney for the Kansas State Board of Health, as *amici curiae.*

The opinion of the court was delivered by

Hoch, J.: The appellant, engaged in the sale of milk near Lawrence, appeals from conviction on five counts for violating rules and regulations of the state board of health. His principal contention is that the power to promulgate rules and regulations relative to the production and sale of milk and other dairy products has been vested by statute exclusively in the state board of agriculture, acting through its agent the state dairy commissioner. This question was raised both by a motion to quash the information and by a demurrer to plaintiff's evidence, both of which were overruled.

Appellant also predicates error upon refusal to admit certain testimony and upon denial of a motion for a new trial.

Several matters should be made clear at the outset.

The first is that conviction was based upon violation of regulations and not upon violation of specfic statutes which prohibit the sale of impure or unwholesome milk. It is true that in each count the allegation that the defendant had committed certain acts in violation of the rules and regulations was followed by the usual declaration that this was "contrary to the form of the statute in such cases made and provided." It is also true that in the opening part of the instructions to the jury the trial court made reference to some of the statutes which prohibit the sale of impure milk or the handling of milk in unclean or insanitary places or in unclean or insanitary utensils. But in instructing the jury on the individual counts, the court referred only to the alleged violation of a rule or regulation and this was evidently in harmony with the theory upon which the prosecution was conducted. It is the theory upon which the case has been here presented by both sides. Accordingly, if it be determined that the rules and regulations are invalid, the conviction must be set aside even though as to certain counts prosecution might possibly have been based upon alleged violation of specific statutes.

The second matter to be made clear is that the issue here does not involve the validity of any city ordinance. Many cities of the state have adopted the so-called standard milk ordinance approved by the state board of health and by the bureau of dairy industry of the United States department of agriculture. The city of Lawrence has adopted such an ordinance, but appellant's place of business was outside the city limits and no sale within the city was alleged. The power of municipalities, in exercising police power for protection of the public health and welfare, to enact and enforce ordinances which may extend regulation beyond the limits of general state statutes dealing with the same subjects, has been many times upheld by this court. (*Kansas City v. Henre*, 96 Kan. 794, 153 Pac. 548; *Garden City v. Legg*, 126 Kan. 569, 268 Pac. 827; 2 McQuillin Municipal Corporations, 2d ed., pp. 699, 700; 3 McQuillin Municipal Corporations, 2d ed., § 1067.) This does not mean, of course, that cities may lawfully, by ordinance or otherwise, contravene the provisions of general statutes. It only means that within reason such ordinances may extend regulation beyond but not in conflict with state law.

Appellant was charged in nineteen counts, but we note only counts I, II, VII, X and XVIII upon which he was convicted by the jury. The charges were, in substance, that he violated the state board of health's rules and regulations in that: (I) he sold four quarts of milk which "was adulterated and misbranded in this, to wit: that said milk contained a bacteria count in excess of one million bacteria per cubic centimeter and which milk was not labeled 'For cooking only' and which milk contained in excess of 700,000 pus cells per cubic centimeter and which contained great amounts of streptococcic bacteria"; (II) he sold four quarts of milk which was "misbranded, mislabeled and misrepresented in this, to wit: that said milk was labeled and sold as pasteurized milk, when in fact said milk was not pasteurized but contained raw milk and was insufficiently pasteurized"; (VII) he failed to "provide or use effective means to prevent the access of flies to milk, milk products, utensils and equipment, in that all openings to the outside were not effectively screened"; (X) he failed to "provide hand-washing facilities, including warm running water, soap and approved sanitary towels"; (XVIII) he failed to "cap the bottles of milk by machine in that he capped bottles of milk by hand." He was sentenced to pay twenty-five dollars fine on each of these five counts, and costs of the action.

In determining whether the power of the board of health to make and enforce regulations relative to the production, handling and sale of milk and other dairy products has been abrogated or limited by the statutes which place such authority in the board of agriculture (specifically the dairy commissioner), we have examined both the substance and the history of the statutes involved and the many regulations issued thereunder. This examination has revealed at once a situation which plainly requires clarification in the interest of those who produce and handle milk for public sale and of the two administrative bodies now assuming to exercise broad powers of regulation in the matter. No implication of bad faith on the part of either of these state agencies is involved in this discussion. Each has naturally felt a duty as well as a right to act within the power which it believed the statutes conferred upon it. The result, however, no matter how high the motives, is a state of confusion and uncertainty from which those subject to the regulations, carrying severe penalties for violation, are entitled to be relieved, if possible. Our power to furnish such relief is limited to

the field of fair interpretation of the meaning and intent of the statutes. If anything beyond that be needed, in fairness to those engaged in the milk business or in protection of the public interest, the task is for the legislature.

In the consideration of the questions presented we have had the benefit not only of briefs submitted by the state and by the appellant, but also by the board of health and the board of agriculture as *amici curiae*. The board of health relies upon the broad powers conferred upon it in matters affecting the public health (G. S. 1935, 65-101, 65-154, 65-155), and particularly upon general provisions contained in the food and drug acts. (Particularly, G. S. 1935, 65-601 to 65-614, inclusive, and 65-625, 65-626.) The board of agriculture stands upon the comprehensive statutes which deal specifically with the production, handling and sale of milk and other dairy products. (G. S. 1935, 75-1401, and particularly 65-701 to 65-708, inclusive, as amended by G. S. 1939 Supp., 65-707, and G. S. 1935, 65-715, 65-716.) For brevity these statutes will be referred to as the food and drug acts and the milk acts, respectively.

Do these two state agencies have overlapping, concurrent regulatory authority as to dairy products, or do the milk acts, being specific in character, withdraw such authority, in whole or in part, from the board of health and vest it in the office of the dairy commissioner, an agency within the board of agriculture?

It would needlessly extend this opinion to review in detail the legislative history of the various statutes involved. In both cases the origins date back more than thirty years. While there was legislation on the matter of public health more than twenty years, prior thereto, the basic food and drug act was enacted in 1907 and substantial amendments made in 1909. In 1907 the office of dairy commissioner was established and basic provisions of the present milk acts enacted. The principal revisions were made in 1909, 1921, and 1927. The enactment of 1927 was a broad and comprehensive revision and extension of the milk acts.

No extended discussion of the food and drug acts is necessary. It is conceded that they are comprehensive in character and that the board of health is given broad powers of administration, including the power to promulgate rules and regulations. The question which here concerns us is whether the legislature, when it enacted the milk acts, dealing comprehensively and specifically with milk and other dairy products, intended to limit or supersede the regulatory power

of the board of health as to those particular products or to leave it unimpaired and to lodge concurrent power, in many particulars, in a second agency, the state board of agriculture, office of dairy commissioner.

The milk acts are too extensive to be here quoted at length. They contain approximately five thousand words covering a number of pages of the general statutes. A sketchy summary of provisions most pertinent to this inquiry will indicate with what particularity their comprehensive provisions deal with dairy products, their production, handling and sale. G. S. 1935, 75-1401, creates the office of dairy commissioner to be appointed by the board of agriculture with office assistants, authorizes the board to appoint such deputies as may be necessary and to prescribe such reasonable rules and regulations as may be necessary to accomplish the purposes of the act. Section 65-701 places upon the commissioner the duty (1) to inspect all places where dairy products are "produced, manufactured, kept, handled, stored or sold within the state; (2) *to prohibit the production and sale of unclean or unwholesome milk*," etc.; (3) to condemn for food purposes such milk, etc.; (4) to take samples for chemical analysis, such analyses to be preserved and recorded as evidence; (5) to assist in compiling and publishing information concerning all phases of the dairy industry and the manufacture of dairy products. Section 65-702 gives to the commissioner and deputies full power to enter places for purposes of inspection, to examine persons under oath, and require public posting of prices, to issue subpoenas, require production of records, and to have attachment issued upon order of district courts—refusal to give testimony to be punishable as contempt. Section 65-703 defines terms; section 65-704 provides in detail for tests as to butterfat and other ingredients; section 65-705 provides for cancellation of permits. Section 65-706 deals at length with requirements concerning cleanliness of premises and utensils. It is declared to be an offense, punishable as provided, (1) to handle milk, etc., "in unclean or insanitary places, or in an insanitary manner," or to handle such products in the same building or enclosure with any hide or fur house, or any cow, horse or hog barns, etc., etc. Directions are given as to outside doors and windows, connecting doors, etc., in the interest of sanitation, and the commissioner and deputies are authorized to forbid the handling of dairy products "in any such place or places as in their judgment are insanitary and will affect the purity of the milk,"

etc.; "(2) to handle, test or ship milk, cream or ice cream or other dairy products *in unclean or insanitary vessels, or to expose milk, cream or ice cream or other dairy products to flies or other contaminating influences likely to convey pathogenic or other injurious bacteria to such milk,*" etc. The section also has lengthy and specific provisions as to the proper handling of dairy products by common carriers and others in order to insure their purity. Other provisions of the section as to the use of registered cans, bottles, etc., need not be recited. The section also makes unlawful the sale, or offer for sale of any dairy products not·produced or handled in conformity with the preceding provisions, or to sell any milk or cream *"from diseased or unhealthy animals or handled by any person suffering from or coming in contact with persons afflicted with any contagious disease"*; or to sell "any milk or cream *exposed to contamination* or into which have fallen any insanitary articles or any foreign substance which would render the milk or cream or the product manufactured therefrom, *unfit for human consumption.*"

Section 65-706 also carries this significant provision: "In all *prosecutions and proceedings for enforcement* in any of the courts of this state *of all laws and regulations pertaining to the production, sale and distribution of dairy products* of any kind whatsoever, *the standards of purity and the definition of said products shall be such as are hereinafter stated.*"

G. S. 1939 Supp., 65-707, covers a page and a half of the 1939 supplement and defines with great particularity "whole milk," "milk for manufacturing purposes," "skimmed milk," "cream"—including "first-grade cream," "second-grade cream," etc., "butter," "cheese," "ice cream," "condensed or evaporated milk," etc. Throughout the section are provisions not only as to content of butterfat and other solids, but as to *purity, cleanliness, freedom from contact with insanitary articles or utensils* and other safeguards in protection of the consuming public. The lengthy provisions of G. S. 1935, 65-708, dealing with licenses, fees, permits, disposition of funds, etc., need not be narrated. G. S. 1935, 65-715, provides for a fine of from twenty-five to two hundred dollars for each violation of any provisions of the act. *"or of any of the rules and regulations based thereon."* Supplementing the many specific provisions of the statute as to sanitation, the dairy commissioner has promulgated various rules and regulations dealing with the washing of vats and bottles, racks for empty bottles, cooling before bottling, use of separate rooms for bottling, tests for sediment, etc.

It certainly cannot be said that these milk acts deal merely with the economic phase of the dairy industry from the standpoint of the producer. On the contrary, we believe that a reading of their provisions will leave the impression of primary and continuing emphasis upon the wholesomeness, the purity of the product, upon the measures to be taken to protect the health of those who consume them. The conclusion is inescapable that the legislature has placed the most comprehensive authority in the board of agriculture to deal with this whole subject.

We must now take notice of the extent to which the board of health, by rules and regulations, has now taken jurisdiction of the production, handling and sale of these dairy products. While there had been some assumption of jurisdiction in this particular field for a number of years prior thereto, it was in 1933 that the board of health first issued rather detailed regulations concerning dairy products. The present extensive regulations were promulgated in June, 1939. It would unnecessarily burden these pages to set them out in full; they comprise fifteen typewritten pages, and deal with nearly every phase of the whole subject matter. We briefly summarize their substance. They define, at length, "milk"—adding provisions not in the statutory definition found in the milk acts—"raw milk," "milk fat or butterfat," "cream," "sweet cream," "first-grade cream," "second-grade cream" (all defined in the milk acts, *supra*), "skimmed milk," "milk beverage," "buttermilk," "vitamin D milk," "reconstituted milk," "reconstituted cream," "homogenized milk," "grade A raw milk," "grade B raw milk," "grade C raw milk," "grade D raw milk," "grade A pasteurized milk," "grade B pasteurized milk" and "grade C pasteurized milk" (to some of these definitions reference will be made later). The regulations provide in detail for labeling of all bottles, cans, etc., to indicate the contents according to the standards and grades hereinbefore indicated, make departure therefrom unlawful, and further provide that violators of such provisions "may be prosecuted for adulteration and misbranding and *in some instances* for violation of the rules and regulations of the board of health."

Among other subjects dealt with in detail by the regulations of the board of health are the following: Construction of dairy barns as to square feet of light for each stanchion and as to artificial lighting, material to be used in floors and gutters, walls and ceilings and frequency of painting, dust-tight partitions and doors; construction

of milkhouses—as to rooms for cooling, handling, bacterial treatment, storage, floor materials, lighting, ventilation, screening, openings, water heating, washing, sterilizing, equipment of wash and rinse vats—all with various modification, depending upon the grade at which the product is to be marketed; detailed requirements as to pasteurizing plants; bottling and capping; hand-washing facilities and bacterial solution used; approved towels; extent and construction of toilet facilities; use of nonabsorbent materials for all multiuse containers; specification as to outer garments to be worn by milkers; milk stools and milk pails; valves on containers, piping, etc.; transfers from one container to another; construction of vehicles used in transporting milk—as to tops, permanent or roll down sides and back, size of openings to pass the deliveryman, etc.

This brief and incomplete summary is not made for any purpose of questioning the desirability or wisdom of any of these rules and regulations or the high motives of the board of health in the matter, but to indicate to what extent the board has entered the field which the milk acts have explicitly and comprehensively placed within the regulatory jurisdiction of the board of agriculture.

The fundamental issue of jurisdiction as between authority conferred by the food and drug acts, general in character, and that conferred by the milk acts, particular and specific in character, is here directly raised for the first time. While the broad power of the board of health to adopt regulations under the general law has been repeatedly upheld, its right to do so as to milk and other dairy products has not heretofore been challenged on the grounds here urged.

It is true that in *State v. Meyer*, 94 Kan. 647, 146 Pac. 1007, decided in 1915, when many provisions were in effect which are now a part of the more comprehensive milk acts of 1927 and 1939, a conviction for violating a regulation of the board of health fixing the standard of milk offered for sale was upheld. But the information was there attacked on other grounds and there is no indication in the opinion that the issue here raised was presented or considered.

The fact that there have been comparatively few clashes of authority and a minimum of variances between the regulations issued by the two boards has little, if any, bearing upon the question of law presented. The inherent conflict or at least overlapping of authority, more definitely revealed by the issuance of the comprehensive milk regulations in June, 1939, by the state board of

health, has become apparent. The probability of increasing uncertainty and confusion is obvious.

We confidently conclude, after careful scrutiny of this whole situation, that the legislature intended to place in the board of agriculture exclusive jurisdiction to regulate the production, manufacture, handling and sale of milk and dairy products—except as hereinafter stated—and did not intend to subject those who are so regulated to dual supervision. While general and special acts must be harmonized and both permitted to stand if possible, it is apparent in this case that a concurrent jurisdiction in respect to identical matters presents a situation of almost inescapable confusion and conflict. We think the situation clearly falls within the well-established rule of statutory construction that where a statute of a general nature and one of a particular or special nature are in conflict, the latter prevails over the former. (*In re Estate of Park,* 147 Kan. 142, 75 P. 2d 842; *Wilson v. Edwards County,* 85 Kan. 422, 116 Pac. 614; 59 C. J. 1056, § 623; 25 R. C. L. 1010, § 250.) The result reached by application of this rule is reinforced in a measure by the fact that the broad revision of the milk acts, made in 1927 and 1939, was subsequent to enactment of the acts dealing with foods and drugs generally, and also by the provision in the latter acts (G. S. 1935, 65-603) which limit the power of the board of health to adoption of rules and regulations "not in conflict with the laws of this state."

We consider now the exception, hereinbefore indicated, to the conclusion that the milk acts have taken from the board of health regulatory power as to milk and other dairy products. The exception relates to the subjects of adulteration and misbranding which are dealt with minutely and comprehensively in the food and drug acts (G. S. 1935, 65-607 and 65-608). There are no comparable provisions in the milk acts. We cannot say that the legislature intended to exempt milk and other dairy products from the general statutes as to adulteration and misbranding or from reasonable regulations issued thereunder by the board of health. We conclude, therefore, that as to adulteration and misbranding, the board of health may make regulations applicable to milk and other dairy products within the powers conferred upon it for such purpose. Such regulations may relate only to the ingredients, the constituent elements, the character or nature of such products in order to safeguard the public health or to prevent deception, and may not other-

wise relate to the sale, or to the production, manufacture or handling of them or to other matters subject to exclusive regulation by the state board of agriculture.

We now consider the individual counts upon which appellant was convicted. The regulations of the board of health upon which counts VII, X and XVIII were predicated clearly relate to matters of production, manufacture or handling which, under the holding of this decision, are within the exclusive jurisdiction of the board of agriculture and the dairy commissioner. The allegations with reference to the access of flies, and to washing facilities, relate to matters specifically dealt with by the milk acts. With reference to counts I and II something further may be said. The latter of the two will be first considered.

Count II alleged the sale of milk under a label "pasteurized" in violation of a regulation relative to misbranding in the matter of pasteurization. Appellant contended that the milk had been pasteurized by approved methods, but such question of fact would have to be treated as determined by the jury if that were the only issue involved in the matter. We find nothing in the milk acts relative to pasteurization of milk to be used as milk. The only reference to pasteurization which we have discovered is a provision that "all milk, cream and milk products shall be pasteurized before used in the manufacture of ice cream. Pasteurization for the purposes of this act is defined to mean the heating of the milk, cream or milk products used in the manufacture of ice cream to a temperature of at least 145 degrees Fahrenheit and held at said temperature for thirty minutes" (G. S. 1939 Supp., 65-707 $E$ [2]). No pasteurization for any "purpose of the act" other than the manufacture of ice cream appears to be provided for. While possibly of no significance in the immediate issue, it may be noted that the pasteurization formula, above quoted, for ice-cream manufacture, differs somewhat from that prescribed by the board of health, and involved in the instant prosecution.

The matter of "pasteurization" is something which deals directly and specifically with the essential nature of the product in its relation to health. Under the food and drug acts it is clearly a case of misbranding if milk is sold under a label "pasteurized" when it has not been pasteurized. What constitutes effective pasteurization is clearly a matter of scientific laboratory determination, intimately related to the findings of medical experts. While the question does

not require present determination, we are not now prepared to say that the board of health is without authority to adopt a regulation concerning misbranding in the matter of pasteurization. In the instant case, however, we are confronted with other provisions of the regulation on the subject of pasteurization which are invalid, under the general conclusions hereinbefore stated. The regulation not only states a bacterial and other formula constituting pasteurization itself, but also provides that all milk for use without cooking which is sold as pasteurized must be *"milk produced, stored, handled and transported in conformance with the rules and regulations adopted by the board of health."* Thus, provisions which this decision holds the board is without authority to promulgate are inextricably tied into count II upon which appellant was convicted. The conviction on that count must perforce fall.

Count I alleged violation of a regulation in the sale of milk containing a bacterial count in excess of one million bacteria per cubic centimeter without labeling "for cooking only" and which contained large numbers of pus cells and streptococcic bacteria. Again we are confronted with much the same situation as that presented as to count II. While there was some conflict of testimony on the question, we proceed here upon the assumption that the consumption of such milk would endanger health. That being true, its sale is clearly prohibited under the milk acts and it was not necessary to invoke a regulation of an administrative agency to sustain a prosecution. But as hereinbefore stated, the charge and the conviction were not for selling impure or unwholesome milk, but for violating a regulation, and again we find that the regulation in question is inextricably tied up with requirements as to production, handling, etc. However, although the conviction on this count must fall on that account, as in the case of count II, we are impelled because of its importance to consider the general question of labeling which is involved.

Does the board of health have authority, under the statutory provisions relating to adulteration and misbranding, to require some such label as "for cooking only" based upon a sound and reasonable formula or standard as to bacterial count or other such scientific laboratory finding? The question is not free from difficulty. The section relative to misbranding (G. S. 1935, 65-608) does not specifically require labels. Specifically, it only makes unlawful any label or brand which is misleading, which does not truthfully disclose the

nature, the character, of the product. However, the section must be construed in connection with the whole act and particularly in connection with the provisions of the preceding section which deals with "adulteration" (G. S. 1935, 65-607). Moreover, the spirit of the enactment as well as the letter must be considered in determining a doubtful question of interpretation. Among the definitions of adulteration is one which reads: "if it contains any added poisonous or deleterious ingredient which may render such article injurious to health." The basic purpose of section 65-608 is to prevent deception of the public. If milk contains any element or ingredient "which may be injurious to health," unless the milk is first cooked, that fact should be made known by proper label. To offer it for sale without such a warning label and with implied representation that it is fit for consumption without cooking is certainly a violation of the intent and purpose of the law. For reasons to be presently noted, the question does not require answer in this case, but we strongly incline to the view that the board of health may require the use of a label such as "for cooking only," under a reasonable regulation based on an excessive bacterial count or other such formula. Nor do we think that the validity of such a regulation based on bacterial count would necessarily depend upon proof that consumption of milk with high bacterial count is invariably harmful to health. It would be sufficient, if reasonably established, upon reliable scientific and medical findings, that milk with excessive bacterial count is substantially more likely to carry disease or infections. The public is entitled to know the nature of the risk it is taking. We are not, of course, here considering any particular standard or formula. The board of health well understands that the formula could not be an arbitrary one, but would have to be authoritatively supported. And it may be well to state again, that such regulation would have to be based upon the nature, the constituency of the product itself and not upon production, handling or other factors whose regulation belongs solely to the board of agriculture.

The conclusions already stated make it unnecessary to consider the other assignments of error.

In view of the important interests involved, administrative and otherwise, it seems well to conclude this opinion with a general summary, in an effort to clarify, as far as possible, a confused statutory situation.

(1) The sale of impure, insanitary, unwholesome milk and other dairy products is an offense under specific statutes, independent of any rules and regulations, and there is no contention that representatives of the board of health may not be competent witnesses in prosecutions thereunder.

(2) This decision in no way involves the validity of milk ordinances, which counsel tell us have been adopted by thirty or more cities of the state.

(3) The standards for milk and other dairy products specifically established by the milk acts cannot be altered by administrative rules or regulations.

(4) Upon the state dairy commissioner and his deputies has been placed the duty of enforcing the milk acts, and upon the state board of agriculture has been conferred the sole power of promulgating rules and regulations as to all matters covered by such statutes.

(5) While we do not now finally determine the matter, we express the present opinion that the state board of health has authority, in the enforcement of provisions of the food and drug acts dealing with adulteration and misbranding, to adopt reasonable regulations in the matter of pasteurization and with reference to bacterial count and other such scientific and medical factors of milk, as far as its essential nature, character and constituent elements are concerned, such regulations being based upon protection of the public health and the prevention of deception; and to prescribe proper branding or labeling requirements in connection therewith. Such regulations, however, may not lawfully deal with matters of production, handling and sale within the jurisdiction of the state board of agriculture.

Regulatory laws are seldom administered without difficulties. Co-operation is needed—by those who are regulated and by those who do the regulating. A considerate attitude, as well as firmness, is called for. In the instant case there appears no reason why each of the two agencies involved should not avail itself fully and freely of the counsel of the other.

The judgment is reversed and the case remanded with directions to set aside the conviction and the sentence.